**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **CAUSE NO. 11-CR-08-01** |
| | § | |
| **ANNA FERMANOVA** | § | |

**ANNA FERMANOVA'S MEMORANDUM IN OPPOSITION TO**
**SECTION V. OF GOVERNMENT'S SENTENCING SUBMISSION**

COMES NOW, Anna Fermanova ("Fermanova"), by and through her attorney of record Scott H. Palmer, and files this Memorandum in Opposition to Section V. of the Government's Sentencing Submission, and respectfully shows the Court the following:

**I.**

A. **Attempts to Characterize Fermanova's Conduct As Having Posed a Threat to "National Security" Are Both Disingenuous and Wholly Inconsistent With the Undisputed Characterization of Fermanova's Intent**

Posited in an effort to circumvent the so-clearly applicable intent of the provisions of U.S.S.G. § 2M5.2, the Government attempts to induce this Court to proceed in a manner inconsistent with the Guidelines by way of invoking the specter of the safety of the men and women of our Armed Forces. The appeal of such a sacrosanct invocation is manifest; regardless of political inclinations, hawkishness or, for that matter, any other personal predisposition that might inform one's opinion in regards to the *manner* which our Armed Forces are employed. Such posturing by the Government is beyond cavil that those who choose to serve have rightly earned a particular measure of deference and consideration that is unassailable.

It is upon the interjection of such considerations - considerations that are necessarily calculated to produce an emotional reaction - that the Government seeks to

have this Court fashion.  Unfortunately, notwithstanding what is indisputably a laudable impulse - *consideration of our troops* - its interjection is so grossly misplaced here as to work nothing short of the most perverse paradox; namely, the Government's *wholly unwarranted* interjection of this consideration is calculated to induce a result precisely contrary with the principles for which we ask our Armed Forces to make their sacrifice - namely, the most fundamental notions of Due Process and literally, justness, that makes our judicial system worthy of their sacrifice.

Accordingly, Fermanova will now demonstrate that: 1) Application (See Note 1 of the  Commentary to U.S.S.G. § 2M5.2) and the controlling Second Circuit authority that has interpreted it compels the determination that Fermanova is entitled to a downward departure based on the wholly *undisputed* characterization of Fermanova's intent, and 2) a consideration of the *undisputed* factual underpinnings of Fermanova's conduct are by circumstance and nature so benign in both *intent* and *potential consequence* as to warrant that the requested departure be of a substantially commensurate nature so as to adequately reflect the intended  and potential lack of harm.

Should Defendant premise her demonstration of her entitlement to relief pursuant to U.S.S.G. § 2M5.2 upon an attack on the credibility of Colonel Kevin McDonnell as it pertains to his personal knowledge regarding certain matters that he substantiates through proper opinion testimony, Defendant would rightly fail.  It is not, accordingly, the Defendant's assertion that Colonel McDonnell does not possess the requisite experience to opine upon certain subject matters contained in his *Declaration*.  A careful reading of the *Declaration* reveals that the conclusion contained in it that seeks to connect Fermanova's actions to the safety of soldiers in Iraq, Afghanistan, and other theaters of

wary, is based entirely upon conjecture, speculation, and abject fantasy. None of the facts attested to by Colonel McDonnell can be attributed to Fermanova or any of her father-in-law's customers. No matter how artfully Colonel McDonnell describes the desperate situation our troops face if our enemies are able to obtain night vision technology, as applied to Fermanova, Colonel McDonnell's declaration has no legal or factual relevance. Additionally, the Government fails to consider that night vision technology is already available in Russia where it is readily available for purchase.

**B.** **Guideline Recognizes That Not All Unlicensed Exports of U.S. Munitions Pose a Threat to National Security**

Application Note 1 of the <u>Commentary</u> to U.S.S.G. § 2M5.2, provides in relevant part:

> The base offense level assumes that the offense conduct was harmful or had the potential to be harmful to a security or foreign policy interest of the United States. In the unusual case where the offense conduct posed no such risk, a downward departure may be warranted.

As the Commentary "assumes" the offense conduct as either being harmful - or having such a potential for harm - to avail herself of the requested departure as contemplated by the Commentary, Fermanova bears the burden of countering this assumption.

Since the promulgation of the Guidelines, both district and appellate courts have faced the persistent necessity of clarifying and refining the obscurities of the Guidelines in terms of plain meaning, intent and application. Notwithstanding the relative infrequency with which U.S.S.G. § 2M5.2 is employed, the precise issue before the Court - namely, the applicable analysis employed in determining a downward departure as contemplated by Application Note 1, *supra.* - has been long resolved by the Second

Circuit.

Accordingly, in regards to the analysis employed upon the assessment of a downward departure premised upon Application Note 1 of the <u>Commentary</u> to § 2M5.2, in *United States vs. Hendron*, 43 F.3d 24, 26 (2nd Cir. 1994), the Second Circuit held that,

> the sensible interpretation of the application note,
> in assessing an individual defendant's eligibility
> for the extraordinary lenience of a downward departure,
> **is to address the normal potential of the offense**
> **conduct as perceived by that defendant** (Emphasis added).

Of course, in light of this analysis, the *Hendron* Court proceeded to deny the downward departure based upon offense conduct that so blatantly revealed the defendant to be not only a sophisticated arms dealer of international scope, but also one seeking to provide arms to a most obviously hostile country; namely, the *Hendron* defendant sought to provide 100 AK-47 assault rifles to *Iraq* post-Operation Desert Storm. That a different result should attach as a result of the undisputed facts of the instant case is manifest.

C.    <u>**The Government's Evidence Bears No Relevance Upon the Requested**</u>
<u>**Departure**</u>

Notwithstanding the existence of the controlling authority of *Hendron,* the Government pursues a different path - a path that counsel wishes to presume was chosen in good faith - in an effort to counter Fermanova's clear entitlement to the requested departure; namely, the *Sworn Declaration of Colonel Kevin McDonnell* (hereinafter, "the Declaration"). Again, presuming that the Government's submission of the Declaration was done in ignorance of *Hendron* - and not in an effort to supplant controlling authority with an appeal to raw emotion - the undersigned respectfully submits that the Declaration can be disposed of upon the showing of its irrelevance to the issue at hand: namely, the

Declaration is necessarily devoid of any consideration bearing upon Fermanova's <u>intent</u> in the commission of the offense conduct.

However, while the undersigned respectfully submits that Declaration is effectively demonstrated to be of no moment to the Court's consideration in light of *Hendron*, counsel feels compelled to address some particularities of the Government's position to the extent that its position, in fact actually *bolsters* Fermanova's entitlement to the requested departure.

**D.      <u>Government's Argument Is Based on Speculation and Not Actual Offense Conduct</u>**

The Government through the Declaration speculates that the scope(s), "once on the open market, they could end up anywhere, including foreign theaters of combat" (<u>See</u> Government's Sentencing Submission Section V. page 5).   Such argument is objectionable because it is so speculative.   In order for Government's concern to be realistic, the conduct of nameless, faceless, other actors - not that of Fermanova, would have to be in play.   One could only imagine the number of steps it would take for one night vision scope to leave the hands of a wealthy Russian hunter and to end up in the hands of the Taliban or Al Qaeda fighter thousands of miles from Moscow.   The attenuation of this idea proffered by the Government belies logic and reason as applied to this case.

The heartland of export cases involve arms dealers or brokers conspiring to export usually large numbers of arms, munitions, or defense articles to country unfriendly to the United States for inextricably military purposes.   Fermanova's case stands apart from the typical export case in nearly every regard.

In assessing whether she is deserving of a downward departure, this Court should consider only the facts of Fermanova's conduct, not speculate about the possibility of illicit conduct of others not before this Court. See *Hendron*, supra.

The Government's unrealistic position appears to boil down to one troubled theory: any person, regardless of their intent - who exports night vision from the United States, necessarily poses a risk to the national security of the United States. The flaw in the Government's rationale is that the argument focuses on the *item exported* rather than the conduct of the *exporter* as mandated by the application note 1 of 2M5.2 and *Hendron*. The Government's misplaced focus would render the application note meaningless. This Court should reject the Government's broad and overreaching argument.

Because the commentary "assumes" the offense conduct was harmful, Fermanova bears the burden of showing the Court that her conduct was not "harmful or had the potential to be harmful to a security or foreign policy interest of the United States". The very fact that the commentary contemplates an "unusual case where the offense conduct posed no such risk" implies that indeed a factual scenario could exist where one's conduct in exporting a munitions or defense article will not pose a risk to the United States. Fermanova firmly believes the facts of her case fit the "unusual" case. When considered against the heartland of the export case, Fermanova's case is indeed different and "unusual" in regards to her station in life, the number of scopes sought to be exported, the end consumer intended for those scopes, the country exported to, and her motivation for doing so.

*United States v. Langley*, 986 F.2d 1419 (5th Cir. 1993), is instructive for when a downward departure under 2M5.2 *is not warranted*. In that case, Langley and his co-

defendant Broussard were arrested in a sting operation in which they agreed to sell third generation night vision goggles for export to North Korea. The defendants transferred one set of the night vision goggles and agreed to furnish a large shipment in exchange for $500,000.00. On appeal Langley complained that the Court should have departed downward based on application note to 2M5.2. The court rejected the argument largely because the scope of the transaction ($500,000.00 worth of night vision goggles) and the destination to where the scopes were being shipped was North Korea, a country hostile to the United States.

Here using the analytical framework of both *Hendron* and *Langley* and comparing Fermanova's conduct to that of *Hendron* and *Langley,* it is clear that this case is indeed outside the "heartland of cases" and is "unusual" for downward departure purposes. Per *Hendron*, this Court must address the "normal potential of the offense conduct as perceived by [Fermanova]". 43 F.3d at 26. As perceived by Fermanova, the scopes in question were intended only for wealthy Russian sportsmen for hunting.

Under this framework her conduct posed zero risk to the national security or foreign policy interest of the United States. As stated above, to hypothesize that the scopes in question would or could end up in the hands of enemy combatants of the United States is nothing but fictional paranoia calculated to try convince this Court that any night vision scope exported without a license will automatically pose a danger to our troops. Because this generalized fear has no factual basis in this case and because Fermanova's case falls outside of the heartland of export cases, this court should grant her motion for a

downward departure based on her conduct not posing a threat to national security. 1

**E.**   **Conclusion**

As stated in Fermanova's motion for non-guideline sentencing (Doc. 22), her conduct consisted of attempting to export to Russia night-vision equipment to her father-in-law who was the Target Master at The Moscow Club, a shooting and sporting club he had worked for 20 years.  Her father-in-law was going to sell the scopes to hunters and members of The Moscow Club. (PSR, ¶15). These facts are undisputed. The Government has not offered a scintilla of evidence to rebut, contradict, or impeach Fermanova's explanation of why she was exporting the scopes and what her family intended to do with them once they reached Russia.  Despite Fermanova's voluntary and detailed explanation of her conduct, the Government refuses to acknowledge that her case is indeed unique and has nothing to do with military use of the scope in question.  Under Second Circuit law and in the context of the application note in U.S.S.G 2M5.2 Fermanova conduct merits a downward departure.

WHEREFORE, PREMISES CONSIDERED, Anna Fermanova prays that this Court will grant her Motion for Downward Departure pursuant to 2M5.2 Application Note 1, as well as the other factors listed in her motion, and sentence her to a term of probation, probation and home confinement, or a term of incarceration less than the guideline range that the Court deems necessary under 18 U.S.C. § 3553(a).

---

1 See, USSG, Ch. ONE, Pt. A, Subpt. 1, Because the Guidelines intend the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted…with those specific exceptions, however, the Commission does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case.

Respectfully submitted,

/s/ Scott H. Palmer
SCOTT H. PALMER

SCOTT H. PALMER, P.C.
15455 North Dallas Parkway
Suite 540, LB 32
Addison, Texas 75001
Telephone: 214-987-4100
Facsimile: 214-922-9900

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

This is to certify that on the 13th day of September 2011, the undersigned electronically transmitted the attached document to the Clerk of the Court using the ECF for filing and transmittal of electronic filing to the following ECF registrant:

Assistant U.S. Attorney
Seth D. DuCharme
Brooklyn, NY

/s/ Scott H. Palmer
SCOTT H. PALMER